UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 16-cv-80490-MIDDLEBROOKS

BRENDA DILLARD, individually and on
behalf of all others similarly situated,

    Plaintiff,

v.

PLATFORM SPECIALTY PRODUCTS
CORPORATION, RAKESCH SACHDEV,
DANIEL H. LEEVER, SANJIV KHATTRI,
WAYNE HEWETT, and FRANK J.
MONTEIRO,

    Defendants.
_____/

## ORDER GRANTING MOTIONS TO DISMISS

This CAUSE comes before the Court on Defendants' Motions to Dismiss the Amended Class Action Complaint. The Amended Class Action Complaint ("Complaint") was filed on February 23, 2015 by Lead Plaintiffs Mukesh Patel and Stephen Waston, individually and on behalf of all others similarly situated ("Plaintiffs"). (DE 38). The Complaint alleges securities fraud under the Securities and Exchange Act of 1934.

On September 7, 2016, Defendant Wayne Hewett ("Hewett") filed a Motion to Dismiss (DE 58, "Hewett's Motion to Dismiss"). On the same date, Defendants Platform Specialty Products Corporation ("Platform"), Rakesh Sachdev ("Sachdev"), Daniel H. Leever ("Leever"), Sanjiv Khattri ("Khattri"), and Frank J. Monteiro ("Monteiro") filed a Motion to Dismiss. (DE 59, "Platform's Motion to Dismiss"). The motions are now fully briefed.

### BACKGROUND

**Parties.** According to the Complaint, Platform, a Delaware corporation headquartered in West Palm Beach, Florida, produces and sells specialty chemical products in the Americas, the

Asia-Pacific region, and Europe. (Compl. ¶¶ 3, 17). Platform operates through two business segments: Performance Solutions and Agricultural Solutions. (*Id.* at ¶ 24). Defendant Leever served as Platform's Chief Executive Officer ("CEO") from October 2013 until December 2015. (*Id.* at ¶ 19). Defendant Sachdev has served as Platform's CEO since January 2016. (*Id.* at ¶ 18). Monteiro was Platform's Chief Financial Officer ("CFO") from October 2013 until August 2015. (*Id.* at ¶ 21). Khattri became CFO in September 2015. (*Id.* at ¶ 20). Hewett was CEO of Arysta LifeScience Limited ("Arysta") from October 2009 until Platform acquired it in February 2015, at which point he served as Platform's President from February 2015 until August 2015. (*Id.* at ¶ 22).

Plaintiffs acquired Platform securities between October 21, 2014 and March 14, 2016 (the "Class Period"). (*Id.* at ¶ 16).

**Allegations.** The Complaint alleges that Defendants made false and/or misleading statements and/or failed to disclose that: (i) Arysta, which Platform acquired on February 17, 2015, had made improper third-party payments in West Africa; and (ii) that the foregoing payments were unlawful under the U.S. Foreign Corrupt Practices Act ("FCPA"). (*Id.* at ¶ 5).

On October 21, 2014, Platform filed a Form 8-K with the SEC announcing that it had entered into a Share Purchase Agreement, in which it had agreed to acquire Arysta, a crop protection and life science company with operations in more than 125 countries, for approximately $3.51 billion. (*Id.* at ¶ 26). Of the $3.51 billion, $2.91 billion would be in cash and $600 million would be in the form of new Series B convertible preferred stock of Platform ("Series B Convertible Preferred Stock"). (*Id.*). On November 5, 2014, Platform held a conference call discussing earnings for the third quarter of 2014, in which Leever addressed the acquisition. Leever announced that Platform had "performed diligence on Arysta, which we announced last week and will close Q1 of 2015." (*Id.* at ¶ 27). Leever also announced that upon

2

closure, "Hewett, the current CEO of Arysta will be joining Platform as our new Corporate President." (*Id.*).

Confidential Witness 1 ("CW1"), President of Arysta North America from September 2011 to April 2015 who reported to Hewett, confirmed that "Platform conducted due diligence on Arysta prior to the acquisition." (*Id.* at ¶ 28). CW1 also explained that Africa was one of Arysta's biggest markets and that Arysta held the largest market share for agricultural products in Africa. (*Id.*). CW1 also explained that, "in the past, Arysta had fired employees located in Afghanistan and India for violating the company's anti-bribery policies." (*Id.* at ¶ 29).

On February 17, 2015, Platform issued a press release and filed a Form 8-K announcing the completion of the Arysta acquisition, which was Platform's largest acquisition to date. (*Id.* at ¶ 30). Platform also announced that upon closing, Arysta's CEO, Hewett, became Platform's President. (*Id.*).

On March 18, 2015, Platform issued a press release and filed its Form 8-K announcing its financial and operating results for the last quarter of 2014 and the year ending December 31, 2014. (*Id.* at ¶ 33). Platform reported a net loss for the fourth quarter ($266.7 million) and the year end ($262.7 million). (*Id.*). That same day, on an earnings call, Hewett stated that, "As you all know we have a very significant concentration in Africa and we've seen a very positive start in the African market." (*Id.* at ¶ 35). On March 30, 2015, Platform filed its annual 10-K report ("2014 10-K"), confirming those results. (*Id.* at ¶ 36). In the 2014 10-K, the following was included:

> [I]n West Africa, we own or operate through partnerships over 90 retail stores. In many cases, growers in this region require additional customer outreach and education as our products and the agronomic techniques to apply them are relatively newer to this market.
> \* \* \*
> We are subject to the FCPA, which prohibits companies and their intermediaries from making payments in violation of law to non-U.S. government officials for

3

> the purpose of obtaining or retaining business or securing any other improper advantage.
>
> \*\*\*
>
> We maintain a Business Conduct and Ethics Policy and a Code of Ethics for Senior Financial Officers which were approved by our Board and cover compliance with the FCPA and similar anti-corruption laws, as well as other legal areas applicable to our operations. We provide compliance training to our employees in an effort to raise awareness, foster compliance and set an expectation of compliance at all levels within the Company. The Business Conduct and Ethics Policy establishes a duty to report non-compliance and provides avenues for making such reports, including a reporting hotline. We also maintain a system for auditing compliance with applicable laws.

(*Id.* at ¶ 36). Defendants Leever, Monteiro, and Hewett signed the 2014 10-K. (*Id.* at ¶ 40). On May 4 and 5, 2015, Defendant Leever sold 369,620 shares of Platform stock, worth approximately $10 million. (*Id.* at ¶ 42).

On May 12, 2015, Platform issued a press release and filed its Form 8-K for the quarter ending March 31, 2015. A net loss of $26.3 million was reported. (*Id.* at ¶ 43). Platform's quarterly report for the period ending March 31, 2015 was filed on May 15, 2015. (*Id.* at ¶ 45). In an earnings call also on May 15, 2015, Hewett stated that "we feel the first quarter financial results highlight the strong underlying health of Agricultural Solutions segment and we're cautiously optimistic for the rest of the year." (*Id.* at ¶ 47). He also said, "Africa for us remained solid." (*Id.*).

On August 12, 2015, Platform issued an 8-K disclosing that Hewett was resigning, effective August 28, 2015. (*Id.* at ¶ 48). According to a confidential witness ("CW2"), "there was internal talk that Hewett left because of 'ethical issues.'" (*Id.*). On August 13, 2015, Platform issued a press release and filed a Form 8-K announcing its financial and operating results for the quarter ending June 30, 2015. (*Id.* at ¶ 49). Platform reported a net loss of $9.1 million for the quarter. (*Id.*). The next day, Platform filed a Form 10-Q for that quarter, reporting the same. (*Id.* at ¶ 50).

4

On August 17, 2015, Platform announced the appointment of Defendant Monteiro as Chief Operating Officer of a Platform subsidiary and "the appointment of Defendant Khattri as Defendant Monteiro's successor as CFO of Platform, effective September 14, 2015." (*Id.* at ¶ 52). On October 23, 2015, Platform announced Defendant Leever's resignation. (*Id.* at ¶ 53). Confidential Witness 3 ("CW3") stated that Leever "was a hothead" and that "due in large part to his difficult temperament, senior leaders from Arysta insisted that Platform's Board of Directors force Leever out of the Company." (*Id.* at ¶ 54).

On November 10, 2015, Platform issued a press release and filed a form 8-K for its results for the quarter ending September 30, 2015, reporting a net loss of $122.3 million. (*Id.* at ¶ 55). On November 16, 2015, Platform filed a Form 10-Q reflecting the same results. (*Id.* at ¶ 57). On December 16, 2015, Platform announced the retirement of Defendant Leever as CEO, effective immediately, and the appointment of Defendant Sachdev as his successor, effective January 5, 2016. (*Id.* at ¶ 36).

On February 29, 2016, Platform filed its 8-K, providing unaudited financial performance for the fourth quarter of 2015 and the year ending 2015. (*Id.* at ¶ 60). In an earnings call that same day, Sachdev stated that "[s]ignificant market share growth in East Africa offset pressure from drought in Southern Africa and a bad monsoon in India." (*Id.* at ¶ 61).

On March 11, 2016, Platform disclosed in its 2015 annual report that it had "discovered certain payments made to third-party agents in connection with Arysta's government tender business in West Africa which may be illegal or otherwise inappropriate" and had "engaged outside counsel and an outside accounting firm to conduct an internal investigation to review the legality of these and other payments . . . including Arysta's compliance with the FCPA." (*Id.* at ¶ 7). "As a result of this news, Platform stock fell $0.28 per share, or 3.16%, to close at $8.57 on March 14, 2016, the following trading day." (*Id.* at ¶ 65). Also on March 14, 2016 close to the

end of the trading day, the Wall Street Journal ("WSJ") published a story describing Platform's March 11, 2016 disclosures, titled "Chemical Company Notifies U.S. of West Africa FCPA Probe." (*Id.* at ¶ 66). On March 15, 2016, Platform stock fell $0.62 per share, or 7.23%, closing at $7.95. (*Id.* at ¶ 67). As a result, Plaintiffs and other Class members suffered "significant losses and damages." (*Id.* at ¶ 68).

The Complaint alleges violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants. Plaintiffs propose a class (the "Class") consisting of all persons who purchased or otherwise acquired Platform stock during the Class Period. (*Id.* at ¶ 69).

## STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing the legal sufficiency of a complaint's allegations, the Court is bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal*. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, the complaint "must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (internal quotations omitted) (citing *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)).

When reviewing a motion to dismiss, a court must construe plaintiff's complaint in the light most favorable to plaintiff and take the factual allegations stated therein as true. *See*

*Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). However, pleadings that "are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 678; *see also Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (stating that an unwarranted deduction of fact is not considered true for purpose of determining whether a claim is legally sufficient).

Generally, a plaintiff is not required to detail all of the facts upon which he bases his claim. Fed. R. Civ. P. 8(a)(2). Rather, Rule 8(a)(2) requires a short and plain statement of the claim that fairly notifies the defendant of both the claim and the supporting grounds. *Twombly*, 550 U.S. at 555-56. However, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Twombly*, 550 U.S. at 556 n.3. Plaintiff's "obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). "Factual allegations must be enough to raise [plaintiff's] right to relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *Id.*

Private securities fraud claims are subject to a heightened pleading standard. "To survive a motion to dismiss, a claim brought under [§ 10(b) and] Rule 10b-5 must satisfy (1) the federal notice pleading requirements; (2) the special fraud pleading requirements found in Federal Rule of Civil Procedure 9(b); and (3) the additional pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ('PSLRA')." *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d at 1296 (11th Cir. 2011).

Under Rule 9(b), the complaint must "set[] forth '(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time

and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.'" *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997)). "A sufficient level of factual support for a 10b claim may be found where the circumstances of the fraud are pled in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (internal quotation marks and citations omitted).

"The PSLRA imposes additional heightened pleading requirements on Rule 10b-5 actions." *FindWhat*, 658 F.3d at 1296. "For Rule 10b-5 claims predicated on allegedly false or misleading statements or omissions, the PSLRA provides that 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)).

## DISCUSSION

### I. Count I – Section 10(b).

Section 10(b) of the Exchange Act forbids (1) "the use or employ[ment] . . . of any . . . deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of Securities and Exchange Commission rules and regulations." 15 U.S.C. § 78j(b). Rule 10b-5 prohibits, *inter alia*, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5 (2004).

8

"To state a claim for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must adequately allege: (1) a material misrepresentation or omission; (2) scienter – a wrongful state of mind; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities market (fraud-on-the-market cases) as transaction causation; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." *Meyer v. Greene*, 710 F.3d 1189, 1194 (11th Cir. 2013) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

**(1) Material Misrepresentation or Omission.** Defendants move to dismiss Count I for failure to plead false or misleading statements. In response, Plaintiffs contend that the following statements improperly "omitted material information concerning Platform's compliance with the FCPA:"

- November 5, 2014 statement that Platform was "perform[ing] diligence on Arysta." (Compl. ¶ 27).

- March 18, 2015 statement that Arysta had a "very significant concentration in Africa," and that there was a "very positive start in the African market." (*Id.* at ¶ 35).

- Statements in Platform's 2014 Form 10-K that (1) Platform maintains a Business Conduct and Ethics Policy; (2) Platform is "subject to the FCPA"; and (3) "growers in [West Africa] require additional customer outreach and education as [Platform's] products and the agronomic techniques to apply them are relatively newer to this market." (*Id.* at ¶ 37).

- February 29, 2016 statement that Platform's "Africa, India and Middle East businesses had a strong year driven by continued growth in private market sales and biosolutions. Significant market growth in East Africa offset pressure from drought in Southern Africa and a bad monsoon in India." (*Id.* at ¶ 61).

(DE 61 at 7-8). As Defendants point out in reply, Plaintiffs have abandoned any argument that the numerous statements identified in the Complaint were false. Instead, Plaintiffs argue that Defendants failed to disclose that Arysta made illegal payments in Africa.

As an initial matter, none of these statements provide an affirmative assurance of FCPA compliance. As to the November 5, 2014 statement that Platform was "perform[ing] diligence on Arysta," Plaintiffs argue that Leever "never disclosed that Arysta's operations in Africa raised the risk that it could face regulatory scrutiny due to potential violations of the FCPA." (DE 61 at 13). Plaintiffs suggest that either (1) Defendants must have discovered the corrupt payments through due diligence and therefore omitted it, or (2) Defendants lied about conducting due diligence. The second option is contradicted by the Complaint itself, wherein Plaintiffs allege "Platform conducted thorough due diligence on Arysta prior to the acquisition." (*Id.* at ¶28). The first option is not supported by any other facts in the Complaint. There are no allegations as to when the illegal payments were made, by whom and to whom, and when and how the illegal payments were discovered by Platform.

As to Hewett's March 18, 2015 statement that Arysta had a "very significant concentration in Africa," and that there was a "very positive start in the African market," Plaintiffs argue that Hewett "never disclosed that these African operations were violating the FCPA." (DE 61 at 13-14). Again, Plaintiffs have not alleged facts to suggest Hewett's statement was misleading because of an omitted material fact. As explained above, there is no allegation as to what Hewett knew about potential illegal payments at that time or even when the payments were made.

Similarly, as to the statements in Platform's 2014 Form 10-K that Platform has Business Conduct and Ethics Policy and is "subject to the FCPA," there are no facts alleged to support Platform's theory that these statements were misleading. Plaintiffs do not contend that these statements were false, but rather that Platform should have disclosed "the truth about the Company's operations in Africa." (DE 61 at 14). Because Plaintiffs have not alleged facts as to what was concealed from shareholders, they have not pled a material omission.

10

Plaintiffs contend that Leever, in the February 29, 2016 statement, failed to disclose that "Platform's growing market share in Africa was a result of bribes or other payments that violate the FCPA." (DE 61 at 14). However, the February 29, 2016 statement simply stated that the Africa business had a strong year driven by growth in certain sales. Plaintiffs have not alleged when the alleged illegal payments were made, whether in 2015 or some other time in Arysta's history prior to Platform's acquisition. Plaintiffs have thus failed to allege that the February 29, 2016 statement was misleading because of an omission.

Plaintiffs' entire omission theory rests on speculation – that illegal payments were made based on the disclosure of Platform's investigation of payments that "may be illegal or otherwise inappropriate"; that Platform knew of those payments as early as November 2014 because it conducted due diligence of Arysta; and that those payments were prior to Platform's acquisition because otherwise it would not have been discovered through due diligence. However, Plaintiffs have not alleged facts to support their theory.

Under Rule 9(b) and PSLRA, Plaintiffs must allege in the Complaint what statements were omitted, the time and place where the statements should have been made, and who was responsible for making the statement that was omitted. Simply alleging that Defendants omitted that Arysta had made improper third-party payments in West Africa and that those payments were unlawful under the FCPA, from various public statements during the approximately 16-month class period is not enough.

Plaintiffs have not satisfied the particularity requirements under Rule 9(b) or PSLRA. The Complaint, thus, fails to plead a material misrepresentation or omission.

**(2) Scienter.** Under PSLRA, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]." § 78u-4(b)(2). "In this

11

Circuit, § 10(b) and Rule 10b-5 require a showing of either an intent to deceive, manipulate, or defraud, or severe recklessness." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634 (11th Cir. 2010) (internal quotation marks and citations omitted). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Bryant*, 187 F.3d at 1287 n.18. Accordingly, "[a] complaint will survive [a motion to dismiss] only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

This inquiry asks "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. In doing so, "courts must consider the complaint in its entirety," and "omissions and ambiguities count against inferring scienter." *Id.* at 322, 326. To survive a motion to dismiss, the complaint must "allege facts supporting a strong inference of scienter for *each* defendant with respect to *each* violation." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (emphasis added) (internal quotation marks and citations omitted).

Instead of directing the Court to facts supporting scienter with respect to each Defendant, Plaintiffs simply argue that it is more plausible that Defendants discovered the alleged improper payments through due diligence prior to acquisition rather than post-acquisition. In support, Plaintiffs cite to the following alleged facts: Platform had a history of acquiring companies and thus experience conducting due diligence, that Platform conducted due diligence on Arysta, that Platform knew Arysta conducted business in Africa, that "Arysta had faced a bribery scandal in

12

the past, which resulted in the termination of the employees that had violated the company's anti-bribery policies," and that Arysta was important to Platform's bottom line. (DE 61 at 18-19). Plaintiffs also cite to two executive resignations, one inside stock sale, and a motive.

**Due Diligence.** Plaintiffs appear to argue that because Platform had acquired other companies before, it knew how to conduct due diligence to uncover improper third-party payments. Plaintiffs allege Platform in fact conducted due diligence, and therefore, Defendants knew about the payments when Platform acquired Arysta. Instead of disclosing that fact to shareholders, Plaintiffs contend Defendants omitted this fact in their public statements because the acquisition was important to Platform financially. While Plaintiffs certainly have a theory that the third-party payments should have been discovered in due diligence, Plaintiffs have not alleged facts to support this theory. Plaintiffs have not alleged who discovered (or should have discovered) the payments, when, and how.

Plaintiffs also cite to the fact that Arysta had fired several "employees located in Afghanistan and India for violating the company's anti-bribery policies." This fact weighs against an inference of scienter, because it indicates Arysta enforced Arysta's anti-bribery policies, instead of ignoring them.

**Resignations.** Plaintiffs cite to Hewett and Leever's resignations as further indications of scienter. (DE 61 at 19). On August 28, 2015, Hewett resigned six months after Platform acquired Arysta. (Compl. ¶ 48). According to CW2, Arysta's former Global Manager for Product Development from May 2012 to July 2014 (*id.* at ¶ 29), "there was internal talk that Hewett left as a result of 'ethical issues.'" (*Id.* at ¶ 48). Two months after Hewett's resignation, "Platform unexpectedly announced that Leever would be resigning." (DE 61 at 20, citing Compl. ¶ 53). Plaintiffs cite to CW3, Executive Assistant to the Senior VP of Human Resources at Platform from July 2015 to June 2016, who stated that "Defendant Leever was a hothead.

13

CW3 states that due in large part to his difficult temperament, senior leaders from Arysta insisted that Platform's Board of Directors force Leever out of the Company." (Compl. ¶ 54). Plaintiffs then conclude that "[w]here, as here, resignations are abrupt and seemingly related to the fraudulent conduct at issue given their proximity to the fraud, resignations further support the inference of scienter." (DE 61 at 20).

Defendants reply that there is no inference of scienter based on either resignation. As to Hewett, Defendants challenge the foundation for CW2's statement that there was internal talk that Hewett left for ethical reasons. CW2 did not work at Platform at the time of Hewett's resignation on August 12, 2015, as the Complaint alleges CW2 left Arysta over a year before in July 2014. I, therefore, discount the allegation that CW2 stated that there was internal talk that Hewett left for ethical reasons. Although the timing of an executive's resignation may strengthen an inference of scienter,[1] the timing of Hewett's resignation, which was approximately six months before Platform's disclosure of potential unlawful payments, does not.[2]

---

[1] See Brophy v. Jiangbo Pharma., Inc., 781 F.3d 1296, 1305 (11th Cir. 2015) (explaining that "various courts have recognized that an executive officer's resignation can strengthen an inference of scienter when it occurs around the same time as an investigation").

[2] Plaintiffs also, in argument, contend:
> Hewett's resignation is especially suspicious given the fact that he effectively relinquished his rights to receive significant sums of money under his compensation arrangement with the Company. Specifically, had Hewett remained employed with Platform, he would have been entitled to vest $5.0 million worth of restricted stock units, receive a potential cash bonus of $25 million under a long-term cash bonus award and an annual cash bonus of up to 200% of his annual base salary of $900,000. These benefits were largely subject to his continued employment with the Company.

(DE 61 at 20). None of these allegations are pled in the Complaint, but are rather contained in a proxy statement filed with the SEC on April 10, 2015, and submitted in response to the Motion to Dismiss. I need not determine whether consideration of unpled facts, which are used to bolster a complaint and are contained in an SEC filing, are admissible at this stage. Even if I considered the additional fact that Hewett left behind a generous salary and potential bonus and stock options, this does not assist Plaintiffs in pleading scienter as to Hewett. Most executives are well compensated and leave behind high salaries and bonuses upon resignation.

14

As to Leever, although Plaintiffs attempt to create an inference of scienter through CW3's statement that Leever had a "difficult temperament," Plaintiffs have not connected this personality trait to the alleged fraud.[3] As with Hewett's resignation, Leever retired four and a half months before the March 11, 2016 disclosure. Based on the allegations in the Complaint, there is nothing suspicious about the timing of Leever's retirement.

More importantly, Plaintiffs have alleged no facts as to Hewett and Leever's involvement in the fraud. Plaintiffs cannot simply rely on Hewett and Leever's positions as high level executives at Platform and suggest that their resignations were suspicious. *See Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 434 (5th Cir. 2002) (resignation of key employees in conjunction with a number of other allegations was insufficient to demonstrate a strong inference of scienter); *In re Corrpro Securities Litigation*, No. 02-CV-1198, 2003 WL 23138459, at *5-6 (N.D. Ohio May 27, 2003) (no inference of scienter created by departure of four CFOs when complaint did not establish any connection between the departures and the Company's misrepresentations).

**Insider Sales.** Plaintiffs cite to one stock sale by Leever of 369,620 shares worth approximately $10 million: "Before the resignations of Hewett and Leever became public knowledge, and before the Company announced the potential FCPA violations arising from Arysta's operations in Africa, Leever sold 369,620 shares of Platform stock for gross proceeds of nearly $10 million on May 4 and 5, 2015, just over a month after completing the Arysta acquisition." (DE 61 at 21, citing ¶ 42).

Stock sales by insiders are only relevant to scienter when they are suspicious. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1253 (11th Cir. 2008). "The complaint must allege some information about the insider's trading history for us to determine whether 'the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal

---

[3] Indeed, CW3 does not represent that the Board forced Leever out, but only that senior Arysta leaders *insisted* that the Board force him out. (Compl. ¶ 54).

15

benefit from undisclosed inside information.'" *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 793 (11th Cir. 2010) (quoting *Mizzaro*, 544 F.3d at 1253). Plaintiffs have not alleged Leever's history of trading, or even the percentage of his shares that he sold, to place this sale into context. An allegation that Leever sold stock on two days totaling $10 million over 10 months before the March 11 disclosure does not raise an inference of scienter. Plaintiffs have cited no other alleged insider sales.

**Motive.** Plaintiffs argue that scienter can be inferred because Defendants had a motive to hide the FCPA issue until after financing was secured to ensure the acquisition was completed:

> Defendants raised $3.1 billion in order to acquire Arysta—the proceeds came from cash on hand, $1.1 billion in senior notes, €350 million in senior notes, and restructuring of credit facilities. ¶32. Had Defendants reported the FCPA violations in advance of the acquisition, Platform would not have been able to raise the vast sums of money that it needed in order to complete this largest and most lucrative of all its acquisitions. ¶32.

(DE 61 at 22). Plaintiffs argue that Defendants were incentivized to complete the acquisition in order to profit by an inflated stock price and to increase executive compensation. Again, while Plaintiffs' theory is that Defendants hid the fact of the alleged FCPA violations to ensure the acquisition went through, Plaintiffs have not pled facts in support. Plaintiffs have not alleged facts suggesting any particular Defendant was motivated to hide any FCPA violation to secure financing. Neither have Plaintiffs alleged that the acquisition would not have been completed if any FCPA violation was disclosed earlier.[4]

---

[4] Even had Plaintiffs alleged that Defendants were motivated to conceal any illegal payments to raise capital to complete the acquisition, Plaintiffs would have likely failed to plead scienter. *See Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 434 (5th Cir. 2002) (finding allegations that defendants were motivated to commit fraud by the need to raise capital, the desire for enhanced incentive compensation, and the desire to sell stock at inflated prices were not enough to pled scienter). *See also Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) ("an allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers.").

16

In sum, Plaintiffs have failed to allege facts to support an inference "that the Company purchased Arysta knowing that Arysta had FCPA issues and hid those issues, only then to undertake an internal investigation, self-report the matters to the SEC and DOJ, and voluntarily disclose them to the public . . . ." (*Id.* at 22). Plaintiffs have not pled scienter as to any Individual Defendant.

As to Platform, "[c]orporations have no state of mind of their own; rather, the scienter of their agents must be imputed to them." *See Thompson*, 610 F.3d at 635. Where, as here, a complaint fails to allege scienter as to a corporate officer, the complaint also fails to allege scienter of the corporation. *Id.* (concluding where complaint fails to sufficiently plead scienter as to any corporate directors or officers, complaint fails to plead scienter as to corporation). Accordingly, the Complaint fails to plead scienter as to Platform.

Because Plaintiffs have not pled a material misrepresentation/omission or scienter, the Complaint fails to state a claim under Section 10(b) and Rule 10b-5.[5]

**B. Count II – Section 20(a).** Section 20(a) of the Exchange Act creates liability for those who control others who commit an underlying violation of the federal securities laws. 15 U.S.C. § 78t(a). Because Plaintiffs fail to plead a primary violation of Section 10(b) of the Exchange Act, Plaintiffs do not plead a violation of Section 20(a). *See Mizzaro*, 544 F.3d at 1237 ("Because a primary violation of the securities laws is an essential element of a § 20(a) derivative claim, we have held that a plaintiff adequately pleads a § 20(a) claim only if the primary violation is adequately pleaded.").

## CONCLUSION

---

[5] Defendants also argue that Plaintiffs have not alleged loss causation because they have failed to adequately allege that the March 11 Disclosure and WSJ Article were a substantial cause of their loss. In support, they cite to the fluctuating stock prices the week before and the week of the alleged corrective disclosures. However, I decline to address this additional argument in light of my finding that Plaintiffs have failed to state a claim under § 10b for failure to allege a material misrepresentation/omission and scienter.

17

The Complaint fails to allege a violation under the Exchange Act. The Amended Class Action Complaint is, therefore, dismissed without prejudice. Plaintiffs may file a Second Amended Complaint by December 23, 2016.[6] Any Second Amended Complaint must be limited to the legal theories and claims already asserted.

**ORDERED AND ADJUDGED** as follows:

(1) Defendant Wayne Hewett's Motion to Dismiss (DE 58) is **GRANTED**.

(2) Defendants Platform Specialty Products Corporation, Rakesh Sachdev, Daniel H. Leever, Sanjiv Khattri, and Frank J. Monteiro's Motion to Dismiss (DE 59) is **GRANTED**.

(3) Plaintiffs may file a Second Amended Complaint by December 23, 2016.

**DONE AND ORDERED** in Chambers in West Palm Beach, Florida, this 7 day of N~~ovember~~ Dec., 2016.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record

---

[6] Plaintiffs have not filed a motion for leave to amend the complaint but have indicated in response to the Motions to Dismiss a desire to amend the complaint.